IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

XCALIBER INTERNATIONAL
LIMITED, LLC,

        Plaintiff,

v.

                                       Case No.  05-2261-JWL

PHIL KLINE, in his capacity as
ATTORNEY GENERAL,
STATE OF KANSAS

        Defendant.

## MEMORANDUM AND ORDER

    This case involves an anti-trust and procedural due process claim by Xcaliber against the Attorney General of the State of Kansas ("the State").  Plaintiff challenges a statutory amendment relating to the Master Settlement Agreement (the "MSA") reached by 46 states and four major cigarette manufacturers in 1998.  By eliminating the immediate refund Xcaliber previously enjoyed, the amendment essentially requires Xcaliber to make higher payments to an escrow fund that ensures adequate funds to pay future medical costs resulting from Xcaliber's cigarette sales within Kansas.  This matter comes before the court on the State's motion for summary judgment, as well as Xcaliber's motion for leave to supplement the record.  For the reasons explained below, the motion for summary judgment is granted, and Xcaliber's motion for leave to supplement the record is denied.

1

## **Brief Background**[1]

The following facts are stated in the light most favorable to Xcaliber, the nonmoving party.  Xcaliber is an Oklahoma cigarette manufacturer that distributes its tobacco products in Kansas, and it did not participate in the MSA signed by 46 states (and other territories), including Kansas, and four of the major tobacco manufacturers.  Under the MSA, these four companies agreed to settle future tort claims with the states.  Because the four companies were the initial participants, they were labeled the original participating manufacturers ("OPMs").  In addition to other measures, the OPMs agreed to make substantial annual payments to the states in exchange for a release from future liability.  Under that agreement, the amount each OPM pays is adjusted annually based on the overall volume (the relative market share) of its cigarette sales.  Each state receives a fixed percentage under that agreement based on the relative amount of cigarette sales there. Under the formula, Kansas's share is 0.8336712%.

To encourage other cigarette manufacturers to contribute funds, the drafters of the MSA allowed them to become subsequent participating manufacturers ("SPMs") if they joined in the agreement.  Those manufacturers who joined within 90 days of the MSA's execution date are

_____

[1] The court offers an abbreviated factual background because the parties agree that the record  and anti-trust issues herein are identical to those in a recently decided federal district court case, *Xcaliber International Limited, LLC. v. Edmondson*, 04-CV-0922 (N.D. Okla., Apr. 5, 2005).   Although the undersigned engaged in a fresh, independent review, the undersigned does concur in the anti-trust analysis in that opinion by Chief Judge Eagan.  Further, because the Tenth Circuit soon will resolve the pending appeal in that case, the court will not duplicate the anti-trust analysis of the opinion in *Edmondson*.

now exempt from making annual payments, provided they meet certain conditions.  Some of

the SPMs are exempt; some are not.  Those  manufacturers who did not join the MSA in any

form, including Xcaliber, are called non-participating manufacturers ("NPMs").

To ensure that the NPMs also provided money for future health care costs, the drafters

of the MSA helped devise what is known as a form escrow statute.  Many of the 46 states,

including Kansas, have enacted escrow statutes.  *See* K.S.A. § 50-6a03(b)(2).  Kansas,

however, soon found that several NPMs, including Xcaliber, had discovered a "loophole" in

the escrow statute.  Before it was amended, the statute provided that if an NPM established that

its payments were greater than the State's "allocable share of the payments that it would have

been required to make in that year under the master settlement agreement . . . had it been a

participating manufacturer," the NPM was entitled to an immediate release of its payments.

*See* K.S.A. 50-6a03(b)(2)(B) (before 2005 amendment).  Thus, many NPMs realized that they

could gain an advantage by restricting their sales to those states that received a low percentage

of funds under the MSA.  For instance, because Kansas's percentage is roughly 0.8%, NPMs

concentrated their sales within Kansas and a few other states to receive an immediate refund

from the State.  They capitalized on the assumption embedded in the MSA's percentage

formula, which the State incorporated into its escrow statute, that they were selling nationally.

To close the loophole, Kansas amended the language of its escrow statue so that

payments by NPMs are no longer immediately refunded as before.  *See* K.S.A. 50-

6a03(b)(2)(B) (as amended in 2005 by "the Amendment").  Kansas is not entitled to

3

permanently retain these payments; rather, they are held in escrow for 25 years to pay for future liability if Kansas ever brings a suit to recoup medical costs.   After 25 years, the State will refund any remaining amount to Xcaliber and the other NPMs.   In essence, the Amendment attempts to bring the NPMs in line with the SPMs and the OPMs who contributed funds to the states under the MSA.

Xcaliber does not challenge the general MSA in this suit; instead, it contends that the Amendment to the escrow statute creates an output cartel and price fixing to benefit OPMs. It alleges that the Amendment is both a "per se" violation of the Sherman Act and also a "hybrid restraint."   The State, in turn, responds that Xcaliber has produced no evidence to support its bald assertion that the OPMs have orchestrated a scheme to drive them from the market.   The State argues that the suit is nothing more than a policy criticism against the State's legislative attempt to close a loophole and make the NPMs stand on equal footing with the SPMs and the OPMs.

The court previously denied the State's motion to dismiss after hearing oral argument. The parties then briefed a motion for summary judgment filed by the State and recently presented a second round of oral arguments to the court.   Both sides presented lengthy explanations that further supplemented the legal analysis in their briefs, and the court allowed counsel for Xcaliber to argue for nearly 90 minutes.   As explained below, the court finds that there is no genuine issue of material fact and that the State is entitled to summary judgment as a matter of law on both the anti-trust challenges and Xcaliber's allegation that the Amendment violates procedural due process.

4

**Standard of Review**

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).   In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Spaulding v. United Transp. Union,* 279 F.3d 901, 904 (10th Cir. 2002).   A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Wright ex rel. Trust Co. of Kansas v. Abbott Laboratories, Inc.,* 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."   *Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Spaulding,* 279 F.3d at 904 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986)).   In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Adams v. American Guarantee & Liability Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler,* 144 F.3d at 671).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Spaulding,* 279

5

F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)); *Anderson,* 477 U.S. at 256; *Celotex,* 477 U.S. at 324. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson,* 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir. 2001). Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Mitchell v. City of Moore, Oklahoma,* 218 F.3d 1190, 1197-98 (10th Cir. 2000) (quoting *Adler,* 144 F.3d at 671). To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibits incorporated therein." *Adams,* 233 F.3d at 1246.

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex,* 477 U.S. at 327 (quoting Fed.R.Civ.P. 1). In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

<u>**Analysis**</u>

**1.     Anti-Trust Claims**

The Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1; *Full Draw Productions v. Easton Sports, Inc*., 182 F.3d 745, 750 (10th Cir. 1999). With the Sherman Act as a statutory base, the Supreme Court has devised two viable

anti-trust theories of relief that Xcaliber alleges in this case: (1) a "per se" violation and (2) a "hybrid restraint."  While at the motion to dismiss stage the court had to accept as true all factual allegations by Xcaliber, the standard is different at the summary judgment stage.  The plaintiff now must come forward with evidence to support its allegations and show that there is a genuine issue of material fact.  The court will examine both anti-trust theories in turn, and it adopts the anti-trust analysis of the recent opinion in *Edmondson*.

      **a.**     **"Per Se" Violation**

Xcaliber first alleges that the Amendment constitutes a "per se" violation under the guidance of *Rice v. Norman Williams Co.*, 458 U.S. 654 (1982).  Under *Rice* and its progeny, "[i]n determining whether the Sherman Act pre-empts a state statute, . . . the inquiry is whether there exists an irreconcilable conflict between the federal and state regulatory schemes."  *Id.* at 659.  In making this showing, "[t]he existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute."  *Id*.  Rather, the state statute is proscribed "only if it mandates or authorizes conduct that necessarily constitutes a violation of the anti-trust laws in all cases . . . ."  *Id*. at 661.

Under this framework, Xcaliber has not substantiated its allegations that the Amendment triggers a "per se" violation.  During oral argument on the motion for summary judgment, counsel for Xcaliber repeatedly emphasized that an "irreconcilable conflict" exists based on "the effect" of the Amendment.  Although he conceded that the plain language of the Amendment might not reveal an obvious conflict, counsel insisted that the actual "effect" of the Amendment was clear.  Stretching the Court's "per se" analysis to include the "effect" of

state legislation, however, directly subverts the holding in *Rice* that "[a] state statute is not preempted by the federal antitrust laws simply because the state scheme might have an anticompetitive effect." *Rice v. Norman Williams Co.*, 458 U.S. at 659.  The Supreme Court earlier had reached the same conclusion, when it insisted that "if an adverse effect on competition were, in and of itself, enough to render a state statute invalid, the States' power to engage in economic regulation would be effectively destroyed." *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 133 (1978).   The Amendment does not "authorize or require" any cigarette manufacturer to fix prices or limit output to prevent gaining market share.   As a result, the Amendment is not a "per se" violation under § 1 of the Sherman Act.

> **b.**     **"Hybrid Restraint"**

Although Xcaliber cannot prove a "per se" violation, the Supreme Court also has recognized the "hybrid restraint" theory.   Under this doctrine, "[c]ertain restraints may be characterized as 'hybrid,' in that nonmarket mechanisms merely enforce private marketing decisions.   Where private actors are thus granted 'a degree of private regulatory power,' the regulatory scheme may be attacked under § 1 [of the Sherman Act]."   *Fisher v. City of Berkeley*, 475 U.S. 260, 267-68 (1986) (quoting *Rice v. Norman Williams Co.*, 458 U.S. at 665 (Stevens, J., concurring in judgment)).

Despite the validity of the doctrine, there is a remarkable difference between the actions taken entirely by the State in this case, and the objectionable conduct referenced in those cases in which the Supreme Court has found "hybrid restraint" violations.   In that sense, the facts here are analogous to those in *City of Berkeley*.   There the court distinguished

*Midcal*[2] and opined that "[t]he hybrid restraints condemned in *Schwegmann* and *Midcal* were thus quite different from the pure regulatory scheme imposed by Berkeley's Ordinance.   While the Ordinance does give tenants—certainly a group of interested private parties—some power to trigger the enforcement of its provisions, it places complete control over maximum rent levels exclusively in the hands of the Rent Stabilization Board."   *Id.* at 269.   Similarly, in this case, the Amendment undeniably offers an incidental benefit to the OPMs by closing the loophole exploited by Xcaliber and other NPMs, but the Amendment does not vest any control within the province  of either the OPMs or the SPMs.   As in *City of Berkeley*, a government entity (here, the State) sets the level of payments and retains plenary power over the amount. Thus, because in this case the OPMs and the SMPs are never provided any 'degree of private regulatory power,' there is no identifiable "hybrid restraint" violation.   *Id*.

## 2.      Procedural Due Process

Independent of the alleged anti-trust violations, Xcaliber also asserts that the Amendment violates its right to procedural due process by forcing it to pay money into the escrow fund without first proving its liability.   In part, Xcaliber misidentifies the purpose behind the escrow payments.   Although many of the cigarette companies may have engaged in fraud, the primary purpose behind the escrow payments and the Amendment is to restrain

---

[2] Under *California Retail Liquor Dealers Assoc. v. Midcal Aluminum, Inc.*, 445 U.S. 97 (1980), a state government action that violates the Sherman Act might nevertheless be permissible if a "clearly articulated" state policy is "actively supervised" by the state.   *Id.*   As the State argues, however, the two-part *Midcal* analysis is triggered only upon a predicate anti-trust violation.   Thus, because Xcaliber has not shown an anti-trust violation, the court never reaches the *Midcal* analysis.

cigarette manufacturers from shifting the medical costs of their products to the State.

As the State argues, it is undeniable that Kansas will be forced to pay for the harms created by Xcaliber and other NPMs.  Xcaliber did not refute this point, nor could it.  On the contrary, its counsel repeatedly stated in oral argument that it actively targets the "poorest" cigarette consumers in Kansas, which further increases the extent to which Xcaliber's sales in Kansas will deplete the state's resources.  Although Xcaliber profits by selling its product to the "poorest" consumers, it is the State that often pays the exorbitant medical bills of these indigent citizens.

Thus, rather than arbitrarily denying Xcaliber its property interest, the State is in fact preventing Xcaliber from passing these medical costs onto the State, much in the same way the State requires automobile drivers to obtain insurance to drive on the State's roads.  *Cf. Bell v. Burson*, 402 U.S. 535, 539 (1971) (noting that "[i]f the statute barred the issuance of licenses to all motorists who did not carry liability insurance or who did not post security, the statute would not, under our cases, violate the Fourteenth Amendment").  In both instances, the State has enacted a law of general applicability.  Here, all cigarette manufacturers who distribute cigarettes in Kansas must either join the MSA as an SPM and make defined payments or contribute to the escrow fund if they choose to remain a NPM.  *See S & M Brands v. Summers,* 393 F. Supp. 2d 604, 634 (M. D. Tenn. 2005).  Either way, every manufacturer is held accountable for the undeniably huge medical costs of its sales imposed on the state.  The cases cited by Xcaliber are wholly inapplicable; the Amendment simply precludes Xcaliber, and every other manufacturer, from externalizing its costs.

10

3.        **Motion to Supplement the Record**

Finally, Xcaliber has filed an untimely motion for leave to supplement the record based on alleged discovery violations by the State.  At no time during the filing of its response or request for an extension did it ever assert this new contention.  Its motion for sanctions is pending, but even if it were to prevail on that motion, additional discovery would only be relevant to the determination of this motion if the information sought were sufficient to save plaintiff from the grant of summary judgment in favor of the State.  Plaintiff, in making this showing, was required to comply with Fed. R. Civ. Pro. 56(f).  It has not done so and counsel merely vaguely stated at oral argument that Xcaliber hopes to receive "more of the same" evidence; thus, the court denies the motion for leave to supplement the record.  *See Price v. Western Resources, Inc.*, 232 F.3d 779, 783-84 (10th Cir. 2000) (holding that where a party opposing summary judgment seeks additional discovery and fails to take advantage of the shelter provided by Rule 56(f) by filing an affidavit, there is no abuse of discretion in granting summary judgment if it is otherwise appropriate).

## Conclusion

Based on the record and arguments presented, the court finds that the Amendment is neither a "per se" violation of the Sherman Act nor a "hybrid restraint."  Xcaliber can point to no issue of material fact to preclude the court from ruling on the motion for summary judgment.  Similarly, its procedural due process challenge is  unsupported by the cases it cites, as the Amendment is a valid law of general applicability.  Finally, because Xcaliber did not comply with the requirements of Fed. R. Civ. Pro. 56(f) by filing an affidavit, the court must

deny its motion for leave to supplement the record.

**IT IS THEREFORE ORDERED BY THE COURT** that the State's motion for summary judgment (doc. 41) is granted, and Xcaliber's motion for leave to supplement the record (doc. 90) is denied.

**IT IS SO ORDERED** this 7th  day of February, 2006.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge